UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

CHRISTIAN VON RABENSTEIN,

                Plaintiff,

      v.

SEALIFT, INC., SAGAMORE SHIPPING, INC.
and SAGAMORE SHIPPING LLC,

                Defendants.

-----------------------------------------------------------------

**MEMORANDUM & ORDER**
10-CV-4336 (MKB)

MARGO K. BRODIE, United States District Judge:

Plaintiff commenced the above-captioned action against Defendants Sealift, Inc.,

Sagamore Shipping, Inc., and Sagamore Shipping LLC alleging negligence, unseaworthiness and

unpaid maintenance and cure in violation of the Jones Act, 46 U.S.C. § 30104 *et seq.*  On

February 28, 2014, Defendants moved for summary judgment on all claims and the parties cross-

moved for sanctions due to spoliation of evidence.  The Court heard oral argument on April 23,

2014.  For the reasons discussed below, Defendants' motion for summary judgment is granted.

The parties' cross-motions for sanctions are denied.

    **I.**   **Background**

        **a.**   **Employment history**

Defendant Sagamore Shipping LLC is the owner of the M/V Sagamore vessel (the

"Sagamore").  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Sagamore Shipping Inc. was merged into Sagamore

Shipping LLC.  (Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Sealift, Inc. is the managing agent of the Sagamore.

(Def. 56.1 ¶ 1; Pl. 56.1 ¶ 1.)  Plaintiff started working for Defendants in 1999.  (Def. 56.1 ¶ 2; Pl.

56.1 ¶ 2.)  Plaintiff served for 1½ years as master of a different Sealift vessel, the M/T Montauk.

(Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.)  As master, Plaintiff was Defendants' representative in many

international ports and was responsible for satisfying all laws and regulations necessary for the vessel's entrance to countries throughout the world. (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.) In November 2006, the M/T Montauk was sold and Plaintiff was offered a position as chief mate aboard the Sagamore. (Def. 56.1 ¶ 2; Pl. 56.1 ¶ 2.) As chief mate, Plaintiff was second in command to the master and was qualified to take over command of the Sagamore if the master were to become ill or injured. (Def. 56.1 ¶ 17; Pl. 56.1 ¶ 17.)

### b. November 10, 2007 incident

On November 10, 2007, Plaintiff fractured bones in both feet while serving as first mate aboard the Sagamore. (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3.) According to Defendants, Plaintiff "jumped" from a "hatch cover" to a cargo container, which was fixed in position. (Def. 56.1 ¶ 3.) Plaintiff asserts that he "stepped" or "tripped," rather than jumped, from the "hatch cover" to the cargo container. (Pl. 56.1 ¶¶ 3, 29.) Plaintiff "shattered his feet" upon landing, could not walk and was carried to his quarters, where he stayed for four days while the Sagamore continued to make its cargo stops. (*Id.* ¶ 40.) Plaintiff underwent surgery in Dubai, United Arab Emirates, (Def. 56.1 ¶ 3; Pl. 56.1 ¶ 3), which included the installation of "disposable hardware on [Plaintiff's] feet," (Pl. 56.1 ¶ 30).

### c. Payment of maintenance and cure

James Hannon, crewing manager and claims manager for Sealift, handled the "payment and cure for Plaintiff's injury."[1] (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.) Plaintiff was paid at a rate of $8 per day from November 29, 2007, through December 31, 2007, pursuant to a collective

---

[1] "The right of a seaman to recover damages for negligent injury arises under the Jones Act and the right to maintenance and cure irrespective of negligence arises under the law of admiralty. These rights are independent and cumulative." *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 240 (1942); *Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 314–15 (2d Cir. 1990) ("The actual cause of the seaman's injury is irrelevant to his right to maintenance and cure.").

bargaining agreement.[2]  (Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)  Plaintiff was also paid for "all unearned

wages he was owed through December 4, 2007."[3]  (Def. 56.4 ¶ 1; Pl. 56.1 ¶ 4.)  According to

Defendants, Hannon and Plaintiff spoke almost weekly, (Def. 56.1 ¶ 5), while Plaintiff

remembers speaking with Hannon about once every two weeks, (Pl. 56.1 ¶ 5).  Hannon told

Plaintiff multiple times that Sealift would pay all his maintenance, cure and unearned wages.

(Def. 56.1 ¶ 6; Pl. 56.1 ¶ 6.)  According to Defendants, Hannon told Plaintiff to submit to him

any medical expenses.  (Def. 56.1 ¶ 7.)  Plaintiff does not recall being told to submit his medical

expenses.  (Pl. 56.1 ¶ 7.)

On January 3, 2008, New York State notified Defendants that Plaintiff had applied for

unemployment benefits.[4]  (Def. 56.1 ¶ 8.)  Hannon understood Plaintiff's application for

unemployment benefits to mean that Plaintiff was "ready, willing and able to work" and "fit for

duty."  (*Id.*)  On February 15, 2008, Defendant received a second notice from New York State

---

[2]  The Second Circuit has held that collective bargaining agreements between vessel owners and unions setting the maintenance rate at $8.00 per day are binding.  *See Ammar v. United States*, 342 F.3d 133, 146 (2d Cir. 2003) ("We are persuaded by the considerations that national labor policy has been built on the premise that by pooling their economic strength and acting through a labor organization freely chosen by the majority, the employees of an appropriate unit have the most effective means of bargaining for improvements in wages, hours, and working conditions." (alteration, citation and internal quotation marks omitted)).

[3]  "When a seaman is injured during his employment on a ship, the ship operator is liable not only for the seaman's maintenance and cure, but also for lost wages."  *Rodriguez Alvarez v. Bahama Cruise Line, Inc.*, 898 F.2d 312, 315 (2d Cir. 1990); *McMillan v. Tug Jane A. Bouchard*, 885 F. Supp. 452, 459 n.9 (E.D.N.Y. 1995) ("In addition to maintenance, an injured seaman is entitled to receive unearned wages until the scheduled end of his or her voyage or term of employment." (citation omitted)).

[4]  An unemployed individual shall be eligible to receive unemployment benefits only if he is able to work and is available for work.  *See Dozier v. Colvin*, No. 11-CV-00740, 2013 WL 1294312, at *10 (N.D.N.Y. Mar. 26, 2013) (citing N.Y. Labor Law § 527); *Butt v. Comm'r of Soc. Sec.*, No. 10-CV-1890, 2011 WL 4628804, at *11 (E.D.N.Y. Sept. 30, 2011) ("In order to file a valid claim for unemployment insurance benefits under New York law, a claimant must be able and available to work." (citing N.Y. Labor Law § 527(1)(a))).

concerning Plaintiff's application for unemployment benefits and again, Hannon took this to mean that Plaintiff was ready, willing, able and fit to work. (*Id.* ¶ 9.) Plaintiff asserts that he was not fit for duty on either January 3, 2008 or February 15, 2008 and never told Defendants that he was "fit for duty" until March 24, 2008. (Pl. 56.1 ¶¶ 8–9; Pl. Aff. ¶ 6.)

### d. Settlement discussions

During a conversation in February 2008, Hannon told Plaintiff that Defendants would like to reach a settlement for all claims and any outstanding expenses that he might have related to his foot injuries. (Def. 56.1 ¶ 11.) The settlement was to include all claims Plaintiff had against Defendants, inclusive of any outstanding expenses for maintenance and cure. (*Id.* ¶ 12.) Defendants offered to settle Plaintiff's claims for $15,000.00. (*Id.* ¶ 13.) Plaintiff contends that he told Hannon explicitly that he did not wish to make a "final settlement." (Pl. 56.1 ¶ 11.)

By letter dated February 27, 2008, Hannon sent Plaintiff a "Red Letter Release." (Def. 56.1 ¶ 14; Pl. 56.1 ¶ 14; Hannon Decl. Ex. D.) The letter stated in pertinent part:

> As per our agreement Sealift will pay you $15,000.00.00 as full and final settlement for any/all claims as a result of your broken ankles and other injuries on board the M/V Sagamore on November, 10, 2007. I have enclosed a release form for you to fill out and return to Sealift. Upon receipt of this completed form I will forward a check.

(Hannon Decl. Ex. D.) According to Defendants, Plaintiff called Hannon and acknowledged receiving the letter and release and told Hannon that he wanted to settle but did not feel comfortable signing the release. (Def. 56.1 ¶ 15.) John Raggio, Vice President of Sealift, contacted Plaintiff by telephone and later told Hannon that Plaintiff represented that he was happy with the $15,000.00 settlement and wanted to get back to work. (*Id.* ¶ 19.) According to Raggio, although Plaintiff did not want to sign the release, Plaintiff represented that he would be

"content" with the $15,000.00 and would not sue. (*Id.*) Given their long relationship, Raggio trusted Plaintiff. (*Id.* ¶ 20.)

Plaintiff asserts that Hannon told him that Plaintiff had to sign the release in order to obtain past due maintenance and cure payment. (Pl. 56.1 ¶ 15.) It was Plaintiff's understanding that when Hannon and Raggio began talking to him about writing Plaintiff a check, the payment concerned money already owed for maintenance and cure. (*Id.* ¶ 19.) Plaintiff made clear to both Hannon and Raggio that he would not sign any release or do anything else to permanently forfeit his legal rights with respect to his injury as he had a "number of concerns regarding the uncertainty of [his] future condition." (*Id.* ¶¶ 20, 32.)

According to Defendants, Raggio directed Hannon to send Plaintiff a check in the amount of $15,000.00 based on Plaintiff's representations that in exchange for that amount, Plaintiff would not sue Defendants for anything "relating to this matter." (Def. 56.1 ¶ 21.) By letter dated March 10, 2008, Hannon sent Plaintiff a check for $15,000.00 (the "Settlement Check"). (Def. 56.1 ¶¶ 22–23; Pl. 56.1 ¶¶ 22–23.) The letter stated, "Enclosed please find a check for $15,000.00 as full and final settlement for any/all claims during your employment on board the MV Sagamore." (Letter dated March 10, 2008 ("Settlement Letter"), annexed to Hannon Decl. as Ex. E.) Plaintiff cashed the check on March 14, 2008. (Hannon Decl. Ex. F.)

### e. Subsequent work history

According to Defendants, on January 2, 2008, Sealift offered Plaintiff a promotion to master; Plaintiff initially accepted but shortly thereafter changed his mind, preferring to "stay in the more physical position of Chief Mate." (Def. 56.1 ¶ 27.) Plaintiff contends that he was still in a wheelchair when offered the promotion and chose to remain as chief mate as it would be

"less pressure, less stress."[5]  (Pl. 56.1 ¶ 27.)  On March 24, 2008, Plaintiff submitted to Hannon a "fit for duty report from [Plaintiff's] doctor" and returned to work on April 1, 2008, as chief mate of the Sagamore.  (Def. 56.1 ¶¶ 24–25; Pl. 56.1 ¶¶ 24–25.)

Until January 2010, Plaintiff worked his normal rotation, and missed no time from work.  (Def. 56.1 ¶ 26.)  Plaintiff contends that his pain became progressively worse throughout this time, eventually resulting in the removal of "hardware" from his feet which cost him approximately $20,000 for the surgery.  (Pl. 56.1 ¶ 26.)  Plaintiff does not assert that he told Defendants that he was in pain at any point during the period of April 1, 2008, when he returned to work, and January 2010, when Plaintiff left to work for another corporation.  Shortly after January 10, 2010, Plaintiff informed Hannon that Plaintiff had accepted a position as master on a vessel operated by another corporation.  (Def. 56.1 ¶ 28; Pl. 56.1 ¶ 28.)

### f.  Medical Care

On December 4, 2007, Gregory G. Solis, M.D. ("Dr. Solis"), an orthopedic specialist in Florida, evaluated Plaintiff's "bilateral calcaneus fractures that were treated in the Arab Emirates."  (Gregory G. Solis evaluation dated Dec. 4, 2007 ("December 2007 Evaluation") at 1, annexed to the declaration of Kenneth Fenelon ("Fenelon Decl.") as Ex. 1.)  Dr. Solis had a "pretty lengthy discussion" with Plaintiff and told Plaintiff that he would have to be "strictly non weight bearing for a minimum of 6 weeks" but that he would "gradual[ly] return to walking with a 4 point gait" but "recovery will be limited."  (*Id.* at 2.)  On January 7, 2008, Dr. Solis recorded that Plaintiff was "doing extremely well," had an "excellent" range of motion and noted that

---

[5]  Plaintiff states that he began to see Dr. Gregory G. Solis, an orthopedic specialist, in Jacksonville, Florida upon returning to the United States on December 4, 2007.  (Pl. 56.1 ¶ 30.) Plaintiff used a wheelchair for the first month of his treatment and spent another month using two crutches and "hobbled around" with a single crutch for another month.  (*Id.*)  Plaintiff was able to walk without crutches by mid-March 2008.  (*Id.*)

Plaintiff's fractures appeared "to be healing well." (Dr. Solis evaluation dated January 7, 2008 ("January 2008 Evaluation") at 1, annexed to Fenelon Decl. as Ex. 1.)

On July 15, 2008, Dr. Solis noted that Plaintiff had just returned from three months overseas, was doing "extremely well" and did "not really hav[e] any pain." (Gregory G. Solis evaluation dated July 15, 2008 ("July 2008 Evaluation") at 1, annexed to Fenelon Decl. as Ex. 1.) Dr. Solis also noted that Plaintiff desired to have the hardware removed. (*Id.*)

On August 4, 2009, Dr. Solis recorded that Plaintiff reiterated his desire to have the hardware in his feet removed. (Gregory G. Solis evaluation dated August 4, 2009 ("August 2009 Evaluation") at 1, annexed to Fenelon Decl. as Ex. 1.) Dr. Solis thought removal "would be beneficial" and "explained the risks and benefits of the surgery" to Plaintiff. (*Id.*) On February 4, 2010, Dr. Solis recorded that Plaintiff had "[p]ainful retained hardware" on his left side, which would be removed at a later scheduled date. (Gregory G. Solis evaluation dated February 4, 2010 ("February 2010 Evaluation") at 1, annexed to Fenelon Decl. as Ex. 1.) On October 5, 2010, following removal of all of Plaintiff's hardware, Dr. Solis noted that Plaintiff complained of "pain and swelling" and prescribed a variety of exercises to Plaintiff, and noted that if Plaintiff continued to suffer pain, cortisone injections and further x-rays may be utilized. (Gregory G. Solis evaluation dated October 5, 2010 ("October 2010 Evaluation") at 1, annexed to Fenelon Decl. as Ex. 1.) Plaintiff later had his hardware removed and the total surgery charges amounted to $23,256.54. (Baptist Health itemized billing, annexed to Fenelon Decl. as Ex. 2.)

## II. Discussion

### a. Standard of Review

Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, "there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Bronzini v. Classic Sec., L.L.C.*, --- F. App'x ---, ---, 2014 WL 943933, at *1 (2d Cir. Mar. 12, 2014); *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013); *Kwong v. Bloomberg*, 723 F.3d 160, 164–65 (2d Cir. 2013); *Redd v. N.Y. Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012). The role of the courts is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.*, 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The court's function is to decide "whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000).

**b. Existence of an oral agreement**

The Supreme Court has held that absent a relevant statute, the "general maritime law, as developed by the judiciary, applies" to maritime contracts, and has characterized general maritime law as "an amalgam of traditional common-law rules, modifications of those rules, and newly created rules." *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 864–865 (1986). "[I]t is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961); *see also Am. Dredging Co. v. Miller*, 510 U.S. 443, 451 (1994) ("[A] State may not require that a maritime contract be in writing where admiralty law regards oral contracts as valid."); *Montauk*

*Oil Transp. Corp. v. Sonat Marine Inc.*, 4 Fed. R. Serv. 3d 897 (S.D.N.Y. 1986) ("[o]ral maritime contracts are valid" (citing *Texaco Export, Inc. v. Overseas Tankship Corp.*, 573 F.2d 717, 720 n.8 (2d Cir. 1978))); *see also Garrett v. Delta Queen Steamboat Co., Inc.*, No. 05-CV-1492, 2007 WL 837177, at *3 (E.D. La. Mar. 14, 2007) ("In the absence of a factual basis rendering it invalid . . . , an oral agreement to settle a personal injury cause of action within the admiralty and maritime jurisdiction of the federal courts is enforceable and cannot be repudiated." (quoting *Strange v. Gulf & South American Steamship Company, Inc.*, 495 F.2d 1235 (5th Cir. 1974))); *Touray v. Glacier Fish Co., Ltd.*, No. 05-CV-1388, 2005 WL 3434522, at *2 (W.D. Wash. Dec. 14, 2005) (finding oral agreements valid in the maritime context so long as there is an offer, acceptance and a meeting of the minds (citing *Sea-Land Serv., Inc. v. Sellan*, 64 F. Supp. 2d 1255, 1261 (S.D. Fla. 1999))); *Sellan*, 64 F. Supp. 2d at 1261 ("Oral settlement agreements are enforceable [under maritime law] 'as long as there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement.'" (quoting *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995))), *aff'd*, 231 F.3d 848 (11th Cir. 2000). However, there is no particular test for determining the existence of an oral contract under maritime law. Therefore, the Court looks to general common law principles for guidance in determining whether an oral agreement existed. *See Great Circle Lines, Ltd. v. Matheson & Co., Ltd.*, 681 F.2d 121, 124, 126 (2d Cir. 1982) (citing general contract principles in determining that an oral maritime contract had been formed between the parties); *Nippon Yusen Kaisha v. FIL Lines USA Inc.*, No. 12-CV-6643, 2013 WL 5663080, at *3 (S.D.N.Y. Oct. 18, 2013) ("Because we are aware of no federal statute that would govern the interpretation of the bills of lading at issue in this case, we will look to common-law principles of contract

interpretation, and will occasionally cite to New York case law to the extent it elucidates such common-law principles.").

In this Circuit, courts look to four factors to determine whether parties intended to be bound by a settlement agreement absent a formally executed and signed agreement: "(1) whether there has been an express reservation of the right not to be bound in the absence of a signed writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Ciaramella v. Reader's Digest Ass'n, Inc.*, 131 F.3d 320, 323 (2d Cir. 1997); *cf. Kilcullen v. Metro N. Commuter R. Co.*, No. 95-CV-6331, 1998 WL 647171, at *6 (S.D.N.Y. Sept. 22, 1998) (applying the *Ciaramella* factors to an oral settlement concerning claims brought under the Federal Employer's Liability Act and the Railroad Safety Appliance Act).[6]

Defendants argue that the parties reached a binding and enforceable oral agreement to settle all claims arising from Plaintiff's foot injuries. (Def. Mem. 6.) Plaintiff contends that a contract was never formed as there was no meeting of the minds as to the terms of the alleged settlement. (Pl. Mem. 6–7.) Although the *Ciaramella* factors for determining the enforceability

---

[6] Citation to caselaw interpreting the Federal Employers' Liability Act is appropriate here because, as the Supreme Court noted in *Garrett*, the Jones Act "is based upon and incorporates by reference the Federal Employers' Liability Act" ("FELA") and both "require[] uniform interpretation." *Garrett*, 317 U.S. 239, 244 (1942); *see also Hopson v. Texaco, Inc.*, 383 U.S. 262, 263 (1966) ("The Jones Act incorporates the standards of [FELA], as amended, which renders an employer liable for the injuries negligently inflicted on its employees by its officers, agents, or employees." (citation and internal quotation marks omitted)); *Hayes v. Cnty. of Nassau*, No. 13-CV-1074, 2014 WL 485891, at *2 (2d Cir. Feb. 7, 2014) (noting that the Jones Act incorporates the standards of FELA).

.

of alleged oral contracts have never been applied to maritime law, the Court uses these factors as guidelines in assessing the instant claim.

### i. Reservation of the right not to be bound absent a signed writing

It is clear that Defendants desired a signed writing as evidenced by their attempt to have Plaintiff complete the "Red Letter Release." (Hannon Decl. Ex. D.) However, according to Defendants, Plaintiff "assured" Raggio that if Defendants "paid him the $15,000.00 he would not sue Sealift for anything relating to this matter," even absent a signed release. (Raggio Decl. ¶ 7.) Thus, under Defendants' account of events, Plaintiff expressly forfeited his right not to be bound absent a signed writing. According to Plaintiff, he expressly refused to sign the release because he did not want to "do anything to permanently forfeit my legal rights with respect to my foot injury." (Pl. Decl. ¶ 11.) Thus, the Court is presented with two competing narratives. Because the Court cannot make a credibility determination, the Court will assign no weight to this factor. *See Touray*, 2005 WL 3434522, at *2 (refusing to weigh the credibility of the parties' competing accounts of an oral settlement agreement concerning a claim arising under the Jones Act).

### ii. Partial performance

Defendants argue that Plaintiff's acceptance and cashing of the $15,000.00 check ratified the oral agreement. (Def. Mem. 8.) Plaintiff does not dispute that Defendants understood that the $15,000.00 was being paid in exchange for "any/all" claims concerning Plaintiff's foot injury. (Hannon Decl. Exs. D–E.) Plaintiff argues that he was already owed money for maintenance and cure and when he received the check, he "understood it to be a payment for what was past due to me."[7] (Pl. Decl. ¶ 12.) The Court does not find Plaintiff's statement

---

[7] Plaintiff never claims that he cashed the Settlement Check but did not read the accompanying letter, which clearly states that the enclosed Settlement Check was in full

plausible.[8]  Instead, the Court finds that Plaintiff's cashing of the Settlement Check ratified the

_____

satisfaction of all claims.  At oral argument, Plaintiff's counsel asserted that Plaintiff never read the letter.  This assertion is not supported by the record.

[8]  Although the Court is careful not to weigh the credibility of Plaintiff's statements, the Court may disregard statements that are contradictory or implausible.  *See Mitchell v. Metro-N. Commuter R.R.*, No. 12-CV-0489, 2014 WL 431343, at *2 (S.D.N.Y. Feb. 4, 2014) ("Although [the plaintiff] may rely on his own testimony in opposing summary judgment, the Court need not credit [his] testimony when it is 'contradictory or rife with inconsistencies such that it was facially implausible.'" (quoting *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010))); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) ("[T]he District Court did not err in granting defendants' motion for summary judgment on the basis that Jeffreys's testimony — which was largely unsubstantiated by any other direct evidence — was so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." (internal quotation marks omitted)).

As Plaintiff admits, Plaintiff was due maintenance payments at a rate of $8 per day.  (Def. Reply 2; Def. 56.1 ¶ 4; Pl. 56.1 ¶ 4.)  Plaintiff was only owed $672 through March 24, 2008, the date Plaintiff submitted a fit for duty report.  It is implausible that Plaintiff believed that Defendants offered $15,000.00 for *maintenance* when Plaintiff knew that he was only owed $8 per day for said benefit, and less than $800.00 at the time he cashed the Settlement Check.  Additionally, it is implausible that $15,000.00 could cover outstanding *cure* as Plaintiff has submitted no evidence that, at the time of the negotiations, Plaintiff had any outstanding medical debt.  Furthermore, Plaintiff cashed the Settlement Check on March 14, 2008, and the only medical records Plaintiff submits to the Court reflect costs incurred on August 20, 2009 and February 17, 2010, (Baptist Health itemized bills, annexed to Fenelon Decl. as Ex. 2), over a year after Plaintiff accepted and cashed the check for $15,000.00.  Notably, Plaintiff does not assert that he submitted any bills or that any bills were rejected by Defendants.  *See Messier v. Bouchard Transp.*, 688 F.3d 78, 81 (2d Cir. 2012) ("The obligation to provide maintenance and cure payments, however, does not furnish the seaman with a source of lifetime or long-term disability income." (citation and internal quotation marks omitted)), *as amended* (Aug. 15, 2012); *Mahramas v. Am. Exp. Isbrandtsen Lines, Inc.*, 475 F.2d 165, 172 (2d Cir. 1973) ("The duty to provide maintenance and cure is imposed to safeguard the seaman from the danger of illness without succor, but it does not extend beyond the seaman's need." (citation and internal quotation marks omitted)).  At oral argument, Plaintiff's counsel suggested that Defendant also owed outstanding lost wages.  However, there is no evidence in the record to support this assertion.  Moreover, Plaintiff's Complaint only alleges unpaid maintenance and cure, not unpaid wages.  (Docket Entry No. 1.)  Plaintiff's failure to allege unpaid wages in the Complaint, in addition to unpaid maintenance, which was contractually set at $8.00 per day, undercuts the unsupported allegation that Plaintiff was owed unpaid wages.  *See Padilla v. Maersk Line, Ltd.*, 603 F. Supp. 2d 616, 630 (S.D.N.Y. 2009) ("Unlike maintenance and cure which may extend for a reasonable period beyond the expiration of the voyage until the point of maximum cure attainable has been reached, wages cease with the end of the voyage or the end of the

settlement agreement between the parties.

In *Sellan*, a court in the Southern District of Florida enforced a settlement agreement between a seaman and his employer despite the seaman's refusal to sign the written agreement. *See Sellan*, 64 F. Supp. 2d at 1264. The court found that the seaman's acceptance of the settlement check ratified the settlement agreement and stated that "[w]here a party accepts the benefits of a settlement agreement . . . and knows, or in the exercise of due diligence should have known, the facts concerning the settlement, the party ratifies the settlement by accepting the benefits . . . ." *Id.* at 1262. Here, Defendants' tender of the $15,000.00 check and Plaintiff's subsequent acceptance by cashing that check, tips this factor in Defendants' favor. *See id.* at 1264 ("Sellan's secret objection cannot operate to permit him to renege after he accepted the terms by cashing the $364,500 check in consideration for the negotiated terms and conditions."); *cf. Touray*, 2005 WL 3434522, at *3 (distinguishing *Sellan* by noting that the defendant "never tendered and plaintiff never accepted any consideration under the [alleged oral] agreement").

### iii. All terms were agreed upon

The terms of the alleged oral agreement are quite simple: $15,000.00 in satisfaction of "any/all" claims concerning Plaintiff's foot injury. Defendants argue that these terms were agreed upon between the parties in separate discussions between Plaintiff and both Hannon and Raggio, and further memorialized in the February 27, 2008 and March 10, 2008 letters. (Def. Mem. 8–9.) Plaintiff disagrees. According to Plaintiff, the discussions about a settlement that occurred in February and March of 2008 referred to money already owed to Plaintiff for maintenance and cure and his refusal to sign the release is evidence of his disagreement with

---

engagement (whichever properly can be considered as the terminal point) and cannot extend beyond such period of time."), *aff'd*, 721 F.3d 77 (2d Cir. 2013).

Defendants' proposed terms of the settlement. (Pl. Dec. ¶¶ 11–12.)

Although misunderstandings are potential consequences of oral negotiations, the letter dated March 10, 2008, which included the Settlement Check, expressly stated that the check was in "full and final settlement for any/all claims during [Plaintiff's] employment on board the MV Sagamore." (Hannon Decl. Ex. E.) Plaintiff admits to receiving the letter and the Settlement Check. (Def. 56.1 ¶ 22; Pl. 56.1 ¶ 22.) Plaintiff does not discuss the content of this letter or how he could form his particular understanding of the $15,000.00 Settlement Check in spite of the clear language in the letter enclosing the Settlement Check. In *Touray*, which involved a Jones Act negligence claim, the court in the Western District of Washington declined to recognize an alleged oral settlement agreement. *Touray*, 2005 WL 3434522, at *3. The court found that the defendants' forwarding of settlement documents did not reflect a *mutual* intent to settle or agreement as to the settlement amount. *Id.* at *2. In finding that there was no "meeting of the minds," the court noted that there was ambiguity as to the final amount of consideration, demonstrated by the lack of tender or acceptance of any consideration under the agreement. *Id.* at *3. Here, unlike in *Touray*, the settlement discussions were lacking in ambiguity and supported by the tendering, receipt of consideration and acceptance of that consideration by cashing the Settlement Check. This factor tips in Defendants' favor.

### iv. Agreement at issue usually the type committed to a writing

Neither party briefed this issue. One court in this Circuit has held that personal injury actions are typically settled by oral agreement. *See Kilcullen v. Metro N. Commuter R. Co.*, No. 95-CV-6331, 1998 WL 647171, at *7 (S.D.N.Y. Sept. 22, 1998); *see also* 8 Am. Jur. Proof of Facts 2d 617 (Originally published in 1976) ("Nor may a release be avoided merely because it was given orally, unless statutory provisions require a writing."). The Second Circuit has not

squarely addressed whether personal injury releases are typically committed to a writing, however, it has stated that "the complexity of the underlying agreement is an indication of whether the parties reasonably could have expected to bind themselves orally." *Ciaramella*, 131 F.3d at 326.

Here, as already noted, the release at issue lacks complexity, suggesting that it is not of the class of settlements that is usually written and formally executed. The substance of the oral agreement as reflected in the Red Letter Release, which Defendants initially wished for Plaintiff to sign, consists of only a single page and is written in plain English. (Hannon Decl. Ex. D.) The letter which enclosed the Settlement Check consists of only two sentences, stating that the enclosed check was in "full and final settlement" of any and all claims. (Hannon Decl. Ex. E.) Courts in this Circuit have held that similarly straightforward agreements are not typically committed to a signed writing. *See Renaissance Search Partners v. Renaissance Ltd., L.L.C.*, No. 12-CV-05638, 2013 WL 6839039, at *5 (S.D.N.Y. Oct. 15, 2013) (finding a contract that included, *inter alia*, a settlement sum, a letter of apology, a confidentiality clause and a mutual release from liability to be "not particularly complex" and therefore not of the type usually reduced to writing), *report and recommendation adopted in pertinent part*, No. 12-CV-5638, 2013 WL 6840109 (S.D.N.Y. Dec. 13, 2013); *Case v. City of New York*, No. 12-CV-2189, 2012 WL 5951296, at *7 (S.D.N.Y. Nov. 28, 2012) (finding a settlement for a single payment of a small sum sufficiently simple to not require written memorialization); *Walker v. City of New York*, No. 05-CV-0004, 2006 WL 1662702, at *9 (E.D.N.Y. June 15, 2006) ("The settlement agreement in this case was for one lump-sum of $7,500.00. There was nothing complex about this agreement."); *cf. Ciaramella* 131 F.3d at 326 (finding that this factor weighed in the plaintiff's favor as the settlement agreement at issue, although not involving a "complicated

business arrangement," spanned eleven pages and "contain[ed] numerous provisions that [would] apply in perpetuity"). This factor tips in Defendants' favor.

In sum, in evaluating these factors, the Court finds that Plaintiff's refusal to sign the release does not preclude a finding that the parties intended to be bound by an oral agreement. To the contrary, the record shows that Plaintiff was, or should have been, aware that by cashing the Settlement Check, Plaintiff accepted that amount as full satisfaction of any and all claims arising from his foot injury or any other claim against the Defendants resulting from his employment. *See Sellan*, 64 F. Supp. 2d at 1264 ("Sellan is equitably estopped from enjoying the fruits of the Agreement, while evading its terms and obligations."). However, finding that the parties intended to bind themselves to an agreement does not end the inquiry. The Court is required to assess the enforceability of Plaintiff's release of all claims by subjecting it to careful scrutiny in accordance with the guidelines articulated by the Supreme Court in *Garrett v. Moore-McCormack Co.*, 317 U.S. 239, 248 (1942).

     **c.**    **Enforceability of the settlement and release**

Employees in admiralty have been analogized to "wards" of the court, therefore, releases executed by such employees must be "subject to careful scrutiny." *Garrett*, 317 U.S. at 248. "[T]he burden is upon one who sets up a seaman's release to show that it was executed freely, without deception or coercion, and that it was made by the seaman with full understanding of his rights." *Id.*; *Harrington v. Atl. Sounding Co., Inc.*, 602 F.3d 113, 124 (2d Cir. 2010) (same). "Relevant factors include: the medical and legal advice available to the seaman at the time of signing, whether the parties negotiated at arm's length and in good faith, and whether there was an appearance of fraud or coercion." *In re Cardinal Servs., Inc.*, 304 F. App'x 247, 253–54 (5th Cir. 2008) (citing *Castillo v. Spiliada Mar. Corp.*, 937 F.2d 240, 244 (5th Cir. 1991) and *Garrett*,

317 U.S. at 248). "Despite the fact that plaintiff is a seaman and therefore entitled to significant legal protections, seamen are no less bound by their voluntary and knowing agreements than are other individuals." *McKelvey v. Am. Seafoods*, No. 99-CV-2108, 2000 WL 33179292, at *1 (W.D. Wash. Apr. 7, 2000).

Defendants argue that Plaintiff was not coerced or deceived and freely agreed not to sue for any claims arising from his foot injury in exchange for $15,000.00. (Def. Mem. 9.) Plaintiff argues that the release is defective for two primary reasons: (1) lack of full understanding of Plaintiff's rights and (2) coercion. (Pl. Mem. 5–6.) The Court addresses each of Plaintiff's claims below.

### i. Lack of full understanding

The Second Circuit has rarely addressed whether a seaman executed a release freely and with full understanding of his rights. In a pair of decisions issued in 1939 and 1941, the Second Circuit assessed releases that were "as extensive as human and legal ingenuity could make" them. *Hume v. Moore-McCormack Lines*, 121 F.2d 336, 337 (2d Cir. 1941); *Bonici v. Standard Oil, Co.*, 103 F.2d 437, 438 (2d Cir. 1939). In *Hume*, the plaintiff burned his hand and told a claim adjustor that he would accept $250.00 in full settlement of any claims. *Hume*, 121 F.2d at 336. The plaintiff was told to see the company doctor and to obtain a discharge from the hospital. *Id.* After doing so and subsequent to a "considerable discussion," the parties arrived at a settlement of $150 and the plaintiff signed a release of "every right" he had against the company. *Id.* at 337. Plaintiff subsequently commenced an action against the company to recover damages related to the plaintiff's development of tuberculosis caused by improper sleeping quarters on board the company's vessels. *Id.* at 336. The Second Circuit found that the validity of the plaintiff's release should be submitted to the jury because, *inter alia*, the plaintiff

had "no lawyer nor other competent advisor representing him when he signed the release," the "meager consideration" in question and the uncertainty concerning the plaintiff's knowledge of his tuberculosis condition at the time he signed the release.  *Id.* at 347.  In *Bonici*, the plaintiff injured his shoulder while working on the defendant's vessel.  *Bonici*, 103 F.2d at 437.  The plaintiff received medical advice from the defendant's doctor.  *Id.* at 439.  After approximately three weeks in the hospital, the plaintiff was paid $89.45 by the defendant and signed a release of "every right" he had against the company.  *Id.* at 437.  Thereafter, the plaintiff had further trouble with his shoulder and commenced an action for damages against the defendant.  *Id.*  The Second Circuit held that "[a] release induced by the diagnosis given by the employer's doctor should not prevent the award of additional maintenance when the diagnosis is shown to have been erroneous, even though it may have been quite honestly made."  *Id.* at 439.

In contrast to *Hume* and *Bonici*, in *Sitchon v. Am. Exp. Lines*, the Second Circuit upheld that validity of a seaman's release where the plaintiff had independent medical and legal advice from his own doctor and lawyer.  *Stichon*, 113 F.2d 830, 832 (2d Cir. 1940); *see also Hume*, 121 F.2d at 337 (noting that the facts in *Stichon* were "substantially the same as in the *Bonici* case but with the important difference that the seaman, before signing the release, had the independent advice of his own physician and his own lawyer").  The Second Circuit stated in *Sitchon* that "the question in any case concerning a seaman's release is whether the seaman, if he is acting alone, has intelligence enough fully to understand the situation and the risk he takes in giving up the right to prosecute his claim or whether, if he is acting under advice, that advice is disinterested and based on a reasonable investigation."  *Sitchon*, 113 F.3d at 832.  The *Sitchon* panel underscored that "[i]f such a settlement as the one in the case at bar is voidable, no release

by a seaman could ever be free from attack, if he subsequently discovered that his injuries were greater than he anticipated when executing the release." *Id.*

### 1. Lack of counsel

Plaintiff argues that the settlement is unenforceable as he lacked legal counsel during negotiations. Plaintiff cites to no authority to support the proposition that a seamen may not release claims under the Jones Act unless he has had legal representation. In *Sitchon*, although the plaintiff there had legal counsel, the Second Circuit's language contemplates a viable release for a seaman "acting alone" as well. *See Sitchon*, 113 F.3d at 832 ("[T]he question in any case concerning a seaman's release is whether the seaman, if he is *acting alone*, has intelligence enough fully to understand the situation and the risk he takes in giving up the right to prosecute his claim . . . ." (emphasis added)); *see also Pereira v. Boa Viagem Fishing Corp.*, 11 F. Supp. 2d 151, 153 (D. Mass. 1998) ("The law is solicitous of seamen, but it does not prevent them from entering into informed and voluntary settlements and from giving binding releases in connection therewith."); *but see Sagastume v. Lampsis Nav. Ltd., Drosia*, 579 F.2d 222, 224 (2d Cir. 1978) (finding pre-discovery summary judgment inappropriate where the appellants argued that the seaman were not given any opportunity to refuse to sign the release at issue, did not speak English and were not represented by counsel). The special solicitude paid to a seaperson's release of personal injury claims stems, in part, from their unique "isolation . . . from the legal, economic, and psychological support of a landbased community." *Capotorto v. Compania Sud Americana de Vapores, Chilean Line, Inc.*, 541 F.2d 985, 987 (2d Cir. 1976). Here, Plaintiff was not isolated from a landbased community. Instead, the record shows that Plaintiff was living at home, attempting to obtain government assistance through unemployment insurance and was utilizing the services of an orthopedic specialist. Although Plaintiff may now regret his decision,

the mere fact that he chose to accept the $15,000.00 payment without advice of counsel does not present a material dispute as to Plaintiff's full understanding of its implications. *Id.*

### 2. Adequate compensation and nature of medical advice

Defendants argue that the sum was adequate since, at the time of settlement, Plaintiff's potential damages appeared limited in severity and duration. (Def. Mem. 10–11.) For support, Defendants note that they had previously paid Plaintiff $3,529 which included $3,153 in unearned wages and $376 in maintenance and cure, covering the period of November 15, 2007, through December 7, 2007. (*Id.*) Defendants also note that Plaintiff was ready and willing to work as evidenced by his statements to Hannon and Raggio, Plaintiff's submission of a fit for duty form, as well as Plaintiff's applications for unemployment benefits. (*Id.*) Plaintiff argues that $15,000.00 in consideration is "grossly inadequate." (Pl. Mem. 11.) However, Plaintiff provides no evidence to support his claim that $15,000.00 was "grossly inadequate," other than his assertion that the sum fails to cover his hospital charges.[9] (*Id.*)

The Supreme Court has made clear that the nature of the medical advice available is a relevant inquiry in assessing the "full understanding" of a seaman's release. *See Garrett*, 317 U.S. at 248. Plaintiff was seeing Dr. Solis, an orthopedic specialist, (Pl. 56.1 ¶ 30), at the time he accepted Defendants' offer of $15,000.00 as a settlement of all claims on March 14, 2008. On December 4, 2007, Dr. Solis had a "lengthy discussion" with Plaintiff and informed him that although Plaintiff could not put weight on his feet for six weeks, Plaintiff's "recovery w[ould] be limited." (December 2007 Evaluation at 1–2.) On January 7, 2008, Plaintiff had already started using crutches and was "pretty comfortable doing so." (January 2008 Evaluation at 1.) Dr. Solis

---

[9] Although true, the medical bills submitted by Plaintiff show that his insurance covered the majority of the hospital charges with Plaintiff paying $2,221.96 and a remaining balance of $465.83.

expected that Plaintiff would be completely off crutches in 6 weeks. (*Id.*) Plaintiff began discussions with Hammon and Raggio in February 2008, and on March 10, 2008, Defendants sent Plaintiff a check for $15,000.00 in full settlement of "any/all" claims. Plaintiff cashed this check without consulting with Dr. Solis, and without seeking any other medical advice.

Plaintiff now argues that the lack of "comprehensive medical appraisal" renders the settlement unenforceable. (Pl. Mem. 4.) The Court disagrees. Although it certainly would have been appropriately cautious for Plaintiff to consult with a physician concerning the adequacy of the proposed settlement, Plaintiff's failure to do so should not be held against Defendants and used to undermine what is otherwise a straightforward settlement and release. Plaintiff offers no explanation as to why he did not seek the advice of Dr. Solis or any other physician with respect to the adequacy of the consideration. Significantly, on January 7, 2008, a month before Plaintiff received the Settlement Check, Plaintiff was seen by Dr. Solis who noted that Plaintiff was "doing extremely well" and was "healing well." (January 2008 Evaluation at 1.) Thus, based on the evidence in the record, Plaintiff had received an unbiased medical assessment at the time Plaintiff determined that the $15,000.00.00 was an adequate settlement. *Cf. McBrien v. U.S. Petroleum Carrier's, Inc.*, 177 F. Supp. 627, 634 (S.D.N.Y. 1959) (upholding a seaperson's release although the injury turned out to be more serious than either party thought at the time). Under these circumstances, the Court cannot determine that $15,000.00 was inadequate as a matter of law. *Cf. Law v. United Fruit Co.*, 264 F.2d 498, 500 (2d Cir. 1959) (noting that a jury should "consider what the knowledge of the parties was as to the seriousness of the injuries and whether the amount he received was adequate in view of the situation *as it appeared at that time*." (emphasis added)); *Bonici*, 103 F.2d at 439 ("[T]he trial court should not have held a seaman's release as always inoperative, but should have considered this release from the

standpoint of the fairness of the conditions under which it was secured and of the settlement which it constituted.").  Although Plaintiff now argues that he harbored a "number of concerns regarding the uncertainty of [his] future condition," (Pl. Aff. ¶ 10), Dr. Solis' evaluations shortly prior to Plaintiff's acceptance of the Settlement Check demonstrate an objectively optimistic assessment of Plaintiff's recovery, (December 2007 and January 2008 Evaluations).  Because Dr. Solis was Plaintiff's own doctor and Plaintiff received at least two separate consultations prior to his acceptance of the Settlement Check, neither the nature of the medical advice Plaintiff received nor Plaintiff's failure to directly discuss the adequacy of the proposed settlement with Dr. Solis, provide a basis to deny the enforcement of Plaintiff's release.[10]  Although a seaperson's release deserves special scrutiny, "a release fairly entered into and fairly safeguarding the rights of the seaman should be sustained" as "[f]air settlements are in the interest of the [employees], as well as of the employers.'"  *Law*, 264 F.2d at 499 (citation and internal quotation marks omitted) (upholding a jury verdict finding the plaintiff's release enforceable and therefore precluding his claim for damages and maintenance and cure).

### ii.  Coercion

Plaintiff also asserts that he was coerced, (Pl. Mem. 6), but provides no evidence to

---

[10]  In 1976, the Second Circuit noted that the propensity of seamen for "rashness" and "credulity" supported a court's ability to sometimes render unenforceable, otherwise valid releases.  *Capotorto v. Compania Sud Americana de Vapores, Chilean Line, Inc.*, 541 F.2d 985, 987 (2d Cir. 1976).  However, the Court notes that among other evidence in the record, including Plaintiff's status as a senior employee with Sealift, his actions in promptly seeking medical attention upon returning to the United States, his application for unemployment insurance, and his refusal to sign the Red Letter Release do not suggest any tendency toward such "rashness" or "credulity."  *Cf. Atl. Sounding Co., Inc. v. Townsend*, 557 U.S. 404, 430, 129 S. Ct. 2561, 2578, 174 L. Ed. 2d 382 (2009) (suggesting that we are no longer in an "era when seamen were often treated with shocking callousness"); *Ammar*, 342. F.3d at 146 (stating that "the need for judicial intervention to protect seamen has been substantially lessened," in the context of determining the enforceability of collective bargaining agreements).

support this assertion. Plaintiff does state that he believed that Defendants ceased payment of maintenance and cure during January and February 2008 as punishment for Plaintiff's unavailability to work. (Pl. Aff. ¶ 9.) However, as discussed above, Plaintiff did not provide Defendants with any documentation for outstanding cure in January or February 2008. Contrary to Plaintiff's suggestion, Defendants did not "stop paying cure" since there was no cure to be paid. However, Plaintiff is correct that he was owed maintenance for this time period. Nevertheless, the Court does not find that the cessation of Plaintiff's $8.00 per day maintenance benefit to be coercive or even indicative of financial stress such that Plaintiff's release should be deemed unenforceable.

In sum, after conducting a close examination of the release as set forth in the March 10, 2008 letter enclosing the Settlement Check, and the surrounding circumstances, the Court finds that Defendants have sufficiently shown that Plaintiff released all claims stemming from his foot injury aboard the Sagamore without coercion or deception and with full understanding of his rights. The release is therefore enforceable and Plaintiff cannot maintain his current claim.

### d. Sanctions for spoliation

The parties have cross-moved for sanctions for spoliation of evidence. Plaintiffs argue that "overtime logs," which reflected Plaintiff's "sleep opportunity," were "must-preserve evidence" that Defendants failed to preserve. (Pl. Spoliation Mem. 2.) Defendants respond that they had no duty to preserve the documents and they lacked the culpable state of mind necessary to impose sanctions. Defendants further assert that Plaintiff had copies of the evidence in question and failed to preserve said evidence.

"Spoliation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999). To succeed on a

spoliation motion the moving party must show "(1) that the party having control over the

evidence had an obligation to timely produce it; (2) that the party that failed to timely produce

the evidence had 'a culpable state of mind'; and (3) that the missing evidence is 'relevant' to the

party's claim or defense such that a reasonable trier of fact could find that it would support that

claim or defense." *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 107 (2d Cir.

2002); *see also In re Pfizer Inc. Sec. Litig.*, 288 F.R.D. 297, 325 (S.D.N.Y. 2013) (quoting

*Residential Funding Corp.*, 306 F.3d at 107).

Defendants monitor work hours for wage purposes on "overtime sheets." (Declaration of

James Hannon dated February 14, 2014 ("Hannon Feb. Decl.") ¶ 5.) Employees normally

receive copies of overtime sheets. (*Id.* ¶ 6.) According to Plaintiff, "it appeared that

[D]efendant[s] might have possessed" the overtime sheets for Plaintiff based on the February 17,

2012 deposition testimony of Robert Leake, a captain for Defendants.[11] (Pl. Spoliation Mem. 2.)

On May 7, 2013, Defendants informed Magistrate Judge Victor V. Pohorelsky, who oversaw

discovery in this case, that they did not possess any "overtime sheets" for Plaintiff. (Def. Ltr.

dated May 7, 2013, Docket No. 23.) Defendants' counsel represented that he requested overtime

records from Defendants on September 23, 2011, but was informed that his client did not have

any such records. (*Id.* at 2.) Plaintiff testified during his deposition that he had overtime records

_____

[11] During his deposition, in response to a question concerning how much overtime
Plaintiff worked on November 9, 2007, Leake stated "That was the day before. The day before
we weren't loading I don't think. I reviewed the logbook. And we didn't have any cargo that
day." (Deposition of Robert Leake ("Leake Dep.") 58:6–10, annexed to Pl. Spoliation Mot. as
Ex. A.) Defendants deny the existence of any "logs." (Hannon Feb. Decl. ¶ 7.) At oral
argument, counsel for Defendants represented that the "logbook" referenced by Leake is a
distinct document from the "overtime sheets" in question, and did not contain any information
relating to Plaintiff's overtime.

at home.  (Pl. Dep. 169:6–8, annexed to the declaration of Gordon Arnott ("Arnott Decl.") as Ex. C.)  Absent any report of insufficient rest, Sealift did not require the maintenance of any such rest log.  (*Id.*)

Defendants received notice of the accident underlying Plaintiff's claim on November 10, 2007.  (Def. Interrogatory Responses at 3; annexed to Pl. Spoliation Mot. as Ex. C.)  However, according to Defendants, they did not receive notice that Plaintiff's claim "was related to fatigue" until Plaintiff served his Complaint on October 13, 2010.  (Def. Spoliation Mem. 1; Hannon Feb. Decl. ¶ 3.)  Defendants claim that Plaintiff never requested overtime sheets or records during discovery.  (Def. Spoliation Mem. 3.)  Instead, Defendants requested that Plaintiff produce any "wage records, including overtime records," in his possession.  (Def. Doc. Request ¶ 27, annexed to Arnott Decl. as Ex. B.)  On February 10, 2012, Judge Pohorelsky deemed factual discovery closed.  (Docket Entry No. 19.)  On May 1, 2013, Plaintiff moved to compel production of "certain overtime logs that remain[ed] missing."  (Pl. Ltr. dated May 1, 2013, Docket Entry No. 31.)  By order dated May 8, 2013, Judge Pohorelsky denied Plaintiff's motion to compel, stating that "[a]mple time had been provided for discovery."  (Order dated May 8, 2013.)  As discussed below, Defendants (1) had no duty to preserve the records after the settlement, and (2) did not have the requisite culpable state of mind.

### i.   Duty to preserve

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation."  *Fujitsu Ltd. v. Fed. Exp. Corp.*, 247 F.3d 423, 436 (2d Cir. 2001); *see also Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998) (The "obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation — most

commonly when suit has already been filed, providing the party responsible for the destruction with express notice, but also on occasion in other circumstances, as for example when a party should have known that the evidence may be relevant to future litigation.").

Defendants argue that Plaintiff's claim fails because Sealift was not in sole control of the evidence Plaintiff seeks.  (Def. Spoliation Mem. 4.)  At issue are overtime sheets for November 2007, copies of which Plaintiff contends he never received.  (Pl. Decl. ¶ 5.)  Although it was common practice for employees to receive copies of all overtime statements upon disembarking a vessel, Plaintiff believes that he never received copies of his November 2007 overtime statements because of the irregularity of his departure following his injury.  (*Id.*)  Plaintiff explains that during his deposition he believed that he had such records, (*see* Pl. Dep. 169:6–8), based on the custom of obtaining copies upon disembarkation, but subsequently discovered that he did not possess the November 2007 overtime sheets, (*id.* ¶ 5).  The Court accepts Plaintiff's representation that he misspoke during his deposition.  Therefore, Defendants were in sole possession of the evidence at issue and cannot escape potential sanction based on the *possibility* that Plaintiff also had copies.

Defendants further argue that Sealift had no reason to believe that Plaintiff was injured due to "fatigue," and therefore had no reason to preserve these records.  (Def. Spoliation Mem. 5.)  For support, Defendants rely on deposition testimony where Plaintiff states that he never complained to the captain that he was overworked.  (*Id.*)  In addition, in the months subsequent to Plaintiff's injury, he never discussed fatigue as a factor with Hannon.  (*Id.*)  Defendants therefore contend that they had no reason "to presume after the incident that Plaintiff's injury was fatigue related so as to give rise to a duty to preserve records related to fatigue, even less so overtime records."  (*Id.*)  Defendants' focus on "fatigue" as operative of its duty to preserve

overtime records is misplaced. When an employee is injured at the workplace, all records of the employee's work schedule are, most likely, relevant. This is so because such records may have a variety of applications in future litigation.[12] *Cf. Gajewski v. United States*, 540 F. Supp. 381, 385 (S.D.N.Y. 1982) (finding that excessive overtime is a Jones Act violation and finding the plaintiff's overtime to raise a "'justifiable inference' of causation" with respect to the plaintiff's negligence claim). Defendants argue that here, there was no expectation of future litigation because Sealift believed, as of March 2008, that all claims relating to Plaintiff's foot injury were settled. (Def. Spoliation Mem. 6.) The Court agrees. Subsequent to settlement, Defendants had no reason to preserve any overtime sheets relating to Plaintiff.[13]

---

[12] Defendants argue that overtime records are not records of sleep or rest, and Sealift did not require any records of rest to be made. (Def. Spoliation Mem. 6.) Again, Defendants' focus is misplaced. Although overtime sheets are not evidence of rest, they are evidence of time during which Plaintiff could *not* have rested. Defendants also argue that even if the overtime records related to rest or sleep opportunities, Plaintiff did not formally request them until his motion to compel which was made subsequent to the close of factual discovery and denied by Judge Pohorelsky. (*Id.* at 7.) Although Plaintiff did not explicitly request "overtime sheets" or "overtime records," Plaintiff did request "any and all logs and daily reports which pertained to or were maintained on the vessel for the six month period before and after the incident" as well as "any and all documents references as and/or contained in the Plaintiff's personnel file and/or payroll file," and "any and all documents . . . that show sleep times for the officers and the crew of the M/V Sagamore for the month preceeding [sic] the date that Plaintiff was injured." (Pl. Doc. Request ¶¶ 11, 15, 25 annexed to the declaration of Gordon Arnott ("Arnott Decl.") as Ex. A.) Overtime records could reasonably be understood as being part of Plaintiff's "payroll file" as well as, albeit indirectly, demonstrative of "sleep times" for the Plaintiff. Therefore, contrary to Defendants' attestations, the overtime records were timely requested. Furthermore, the "obligation to preserve relevant evidence exists whether or not the evidence has been specifically requested in a demand for discovery." *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 409 (S.D.N.Y. 2010). Nevertheless, Plaintiff presents no evidence to rebut Defendants' assertion that by the time Plaintiff requested the documents, almost four years after the initial incident and settlement, the overtime sheets were no longer in Defendants' possession.

[13] Plaintiff argues that "irrespective of his injury lawsuit or any alleged settlement having been executed, Sealift had a legal duty (imposed by the federal regulations) to maintain Plaintiff's November 2007 overtime statements at least until November 2010." (Pl. Spoliation Reply Mem. 3.) The Second Circuit has stated that "under some circumstances, [a record

Defendants cross-move due to Plaintiff's gross negligence or wilful destruction of Plaintiff's copies of overtime sheets. (Def. Spoliation Mem. 9.) Plaintiff contends that he provided Defendant with "all copies of overtime statements that [Plaintiff] had in his possession," on January 16, 2013. (Overtime Statements, annexed to Fenelon Decl. as Ex. 1.) As discussed earlier, Plaintiff now clarifies that he misspoke during his deposition and never had possession of the November 2007 overtime sheets. (Pl. Decl. ¶¶ 4–5.) Defendants' cross-motion is based on mere conjecture and is denied. *Cf. Alaimo v. Trans World Airlines, Inc.*, No. 00-CV-3906, 2005 WL 267558, at *3 (S.D.N.Y. Feb. 3, 2005) ("Since plaintiff has not establish[ed] that the records and documents she sought ever existed, there can be no finding of spoliation of evidence."); *see also Morgenstern v. Cnty. of Nassau*, No. 04-CV-0058, 2008 WL 4449335, at *7 n.3 (E.D.N.Y. Sept. 29, 2008) ("It is entirely unclear that any relevant e-mails were destroyed, and therefore the Court cannot deny summary judgment based on spoliation.").

### ii. Culpable state of mind

"Even where the preservation obligation has been breached, sanctions will only be warranted if the party responsible for the loss had a sufficiently culpable state of mind." *Estate of Jackson v. Cnty. of Suffolk*, No. 12-CV-1455, 2014 WL 1342957, at *11 (E.D.N.Y. Mar. 31,

---

retention] regulation can create the requisite obligation to retain records, even if litigation involving the records is not reasonably foreseeable." *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 109 (2d Cir. 2001). Plaintiff asserts that Defendants violated such a regulation, 29 C.F.R. § 516.5, which requires Defendants to keep "payroll records," and the overtime sheets in question "unquestionably" qualify as payroll records. (*Id.*) At oral argument, Defendants argued that the overtime sheets in question were not "payroll records," and that the law only imposed a two-year duty to preserve these records. Defendants are correct. The more applicable regulation is 29 C.F.R. § 516.6, which requires employers to retain "basic employment and earning records" which include the "daily starting and stopping time of individual employees." 29 C.F.R. § 516.6(a)(1). However, Defendants' regulatory duty to preserve only lasted until November 2009, almost a year prior to Plaintiff's commencement of the instant action. Therefore, the Court finds that Plaintiff's reliance on federal regulation as creating a duty to preserve is misplaced.

2014) (quoting *In re WRT Energy Sec. Litig.*, 246 F.R.D. 185, 195 (S.D.N.Y. 2007)).  Failures to preserve evidence "occur along a continuum of fault — ranging from innocence through the degrees of negligence to intentionality."  *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 267 (2d Cir. 1999) (citation and internal quotation marks omitted).  A culpable state of mind "must, at a minimum, constitute simple negligence."  *Dataflow, Inc. v. Peerless Ins. Co.*, No. 11-CV-1127, 2013 WL 6992130, at *6 (N.D.N.Y. June 6, 2013) (quoting *Wade v. Tiffin Motorhomes, Inc.*, 686 F. Supp. 2d 174, 194–95 (N.D.N.Y. 2009)), *report and recommendation adopted in pertinent part*, No. 11-CV-1127, 2014 WL 148685 (N.D.N.Y. Jan. 13, 2014); *Liberman v. FedEx Ground Package Sys., Inc.*, No. 09-CV-2423, 2011 WL 145474, at *4 (E.D.N.Y. Jan. 18, 2011) ("A 'culpable state of mind' can mean 'knowingly, even if without intent to breach a duty to preserve [the evidence], or negligently.'" (alteration in original) (quoting *Residential Funding Corp.*, 306 F.3d at 108)).

Plaintiff argues that once on notice of litigation, the failure to issue a written litigation hold constitutes gross negligence.  (Pl. Spoliation Mem. 5.)  However, Plaintiff fails to acknowledge that gross negligence for failure to issue a written litigation hold will only arise once a duty to preserve attaches.  *See Toussie v. County of Suffolk*, No. 01-CV-6716, 2007 WL 4565160, at *7 (E.D.N.Y. Dec. 21, 2007) ("[O]nce the duty to preserve attaches, at a minimum, a litigant is expected to 'suspend its routine document and retention/destruction policy and to put in place a litigation hold.'" (quoting *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003))).  Here, any plausible duty to preserve ended with the March 2008 settlement.  Defendants argue that Sealift was not grossly negligent in failing to preserving Plaintiff's

overtime sheets because there was no duty to preserve those overtime sheets.[14]  (Def. Spoliation

Mem. 8.)  Defendants are correct.  As already discussed, given the ostensible settlement between

the parties, there was no duty to preserve the overtime sheets in question and, thus, no negligence

for failing to preserve said overtime sheets.  *Cf. Jackson v. AFSCME Local 196*, No. 07-CV-

0471, 2010 WL 864509, at *3 (D. Conn. Mar. 10, 2010) (holding that a settlement between the

plaintiff and a co-defendant state agency did not relieve defendant-union, a separate entity, from

its duty to preserve relevant evidence).

### III.  Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment

and denies the parties' cross-motions for sanctions based on spoliation of evidence.  The Clerk of

Court is directed to close this case.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: May 9, 2014
       Brooklyn, New York

_____

[14]  Defendants also argue that there is no evidence that they willfully or purposefully
destroyed the overtime sheets.  (Def. Spoliation Mem. 7–8.)  However, Plaintiff argues that
Defendants were grossly negligent, not willful nor purposeful in failing to preserve the evidence
in question.  (Pl. Spoliation Mem. 5.)